PRO # 96A102149

FILED (DROP BOX)

OCT 09 2020

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

**SEALED**

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF WASHINGTON *ex rel.* by JEANETTE NYMAN,<br><br>Plaintiff,<br><br>vs.<br><br>DAIYA HEALTHCARE, PLLC, a Washington Corporation<br><br>Defendants. | NO. 20-CV-1525 TSZ<br><br>COMPLAINT AND JURY DEMAND<br><br>**Filed Under Seal**<br>pursuant to<br>31 U.S.C. §3730(b)(2) |

COME NOW the United States of America, and Washington State, by and through Jeanette Nyman, *qui tam* as Relator, and for a cause of action allege as follows:

## I. JURISDICTION and VENUE

1.1 Jurisdiction exists pursuant to 31 U.S.C. §3730(b)(1) and 31 U.S.C. §3732 in that this action seeks remedies on behalf of the United States of America for violations of 31 U.S.C. §3729 by the Defendants.

1.2 To the best of Relator's personal knowledge, the allegations or transactions upon which this suit is based have not been publicly disclosed in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, or audit, or by the news media. 31 U.S.C. 3730(e)(4)(A).

COMPLAINT AND JURY DEMAND - 1

Teller Law
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1.3 The *Qui Tam* plaintiff (Relator Nyman) is an "original source" in that she "has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. §3730(e)(4)(B). She has been providing information in advance of this litigation to agents of the United States Government in connection with this matter.

1.4 Defendant DAIYA HEALTHCARE, PLLC (hereinafter "DAIYA") is a Washington Corporation which resides and transacts business at Bellevue, Washington, and elsewhere within the Western District of Washington.

1.5 Venue exists in this District pursuant to 31 U.S.C. §3730(b)(1) in that Defendant is qualified to do business in the State of Washington and transacts substantial business in the Western District of Washington.

## II. PARTIES

2.1 The Defendant staffs multiple healthcare facilities in Washington State, including in this district and is engaged in the business of providing healthcare services at rehabilitation centers and nursing homes through employees including doctors, nurses, ARNPs, Physician-Assistants, and other providers.

2.2 Many of the patients treated by DAIYA-employed providers are receiving financial support through the Medicare and Medicaid programs of the United States and State of Washington governments, and DAIYA receives payments from Medicare and Medicaid for treating some or all of its patients.

2.3 Relator NYMAN resides in the Western District of Washington. She is a former employee of the DAIYA, who was at material times employed in the capacity of an ARNP from April, 2020 through approximately September 14, 2020.

2.4 The State of Washington and the US Government are government entities whose involvement herein includes paying for services provided by DAIYA to nursing home and rehabilitation center patients through government medical insurance known as Medicare and Medicaid, and related programs ("Medicare and Medicaid").

## III. STATEMENT OF FACTS

### A. Regulations Limit Amounts and Types of Payments for Services

3.1 The laws, regulations and policies pertaining to the United States Department of Health and Human Services and the State of Washington mandate that Medicare and Medicaid funds may be paid to health care providers for services provided to qualified patients, but only in certain amounts for certain services.

3.2 For example, medical services billed to the government must be medically indicated and needed by the patient. Unnecessary services are not properly billed to the government.

3.3 As another example, Medicare and Medicaid pay only for services actually provided. Where a healthcare provider entity such as DAIYA provides lesser services but bills for greater or more expensive services, such "upcoding" is unlawful.

3.4 For providers such as DAIYA, knowingly billing Medicare, Medicaid, or other similar government services for unnecessary treatment, or for more expensive treatment than was actually provided, constitutes the submission of false claims for payment.

### B. Defendant DAIYA provides services of healthcare workers to nursing homes

3.5 DAIYA Healthcare PLLC was formed in 2019 and is governed by Bhupinder Walia, M.D., who is also the CEO. Dr. Walia was born in 1983 and was issued his medical license in April, 2011. He works with Ms. Chris LaFrenz, born in 1968 and licensed as an RN in August 1991. Ms. LaFrenz is the Chief Operating Officer.

3.6  DAIYA provides healthcare workers to nursing homes and assisted living facilities in Washington, Oregon, Idaho, and Hawaii. Its website indicates that it works with over 60 such facilities.

3.7  The organizational setup appears to be similar across multiple facilities. Each long-term care "nursing home" or rehabilitation facility is owned by other entities, but serviced on site by a DIAYA-employed Internal Medicine ("IM") mid-level provider, e.g., an ARNP or PA, who works in the facility, plus about four or five more providers who see patients via telemedicine. These telemedicine providers include an Internal Medicine physician who does 30-day visits on each patient as well as typically three or four ARNP specialists who have specialty licenses or special focus in areas such as pain, cardiovascular diagnoses, mental health, kidney function and/or sleep medicine.

3.8  Relator NYMAN was initially assigned to telemedicine as a pain specialist at DAIYA-staffed facilities in western Washington State comprising the "North Pod." They include Prestige in Centralia, Foss Home and Village in Seattle, Aldercrest rehab in Shoreline, and Burien Nursing and Rehab in Burien. For reasons described below she was moved to an Internal Medicine role, full time at a rural facility in Shelton, Washington.

3.9  The Shelton facility is called Fir Lane Health and Rehabilitation and is operated by Cornerstone Healthcare Services, LLC. Fir Lane serves as a temporary or permanent residence for about 84 patients. Ms. Nyman acted as the IM ARNP for Fir Lane from July 27, 2020 to September 12, 2020 when her employment was terminated by COO Chris LaFrenz.

**C. Defendant DAIYA provides unnecessary care**

3.10  All full time providers have a 16-patient per day minimum workload. As a result, they see all patients regularly, regardless of medical or mental health need.

COMPLAINT AND JURY DEMAND - 4

3.11 Treatment providers are scheduled by an assistant (an "MSC") for 16 patients a day, often for three different diagnoses in one visit, and frequently including diagnoses outside of their specialty. Ms. Nyman, for example, as an Internal Medicine provider, was scheduled to see patients for bipolar disorder or schizophrenia. Additionally patients are seen by the Internal Medicine physician every 30 days for all diagnoses.

3.12 Providers are pressured to find a replacement patient if a pre-scheduled patient cannot be seen. Often the schedules reflected an alleged reason for the visit, but other times no reason is given.

3.13 Ms. Nyman was told by a DAIYA employee recruiter that she would receive a $10,000 to $20,000 annual bonus if she saw 18 to 20 patients a day. On information and belief, the DAIYA recruiter tells all new hires that a bonus for extra patient visits is available.

3.14 Because of the 16 patient per day mandate, providers are frequently unable to spend enough time with some acute patients to manage their care, while for others they are encouraged to 'upcode' as well as provide unnecessary treatment and/or false billing.

3.15 Multiple acute patients were removed from the facilities by family or guardians due to inadequate care, and others were admitted to hospital due to inadequate care, in part caused by the pressure on providers for 16 or more billing visits per day.

3.16 Chief Operating Officer LaFrenz appears to be a chief architect of this overbilling scheme. LaFrenz is aware that in order to see that 16 patients every day, regardless of how many residents need care that day, some visits must be fabricated or exaggerated. For example, Ms. LaFrenz directed an ARNP who works at a Centralia (and whose name has been provided to the government) facility to record a visit and bill for a lab review by poking her head into the room to "see" the patient only briefly without significant verbal or physical contact so that the

provider would have time for her other 15 visits that day, and could still bill for a patient treatment visit when in reality she was merely checking a lab result without need for contact with the patient.

3.17 With approximately 84 patients at Fir Lane, Relator was scheduled to see each patient approximately every four or five days. The four telemedicine providers also saw patients at Fir Lane and other facilities, so on average each patient saw more than one provider per week, again often outside the provider's specialty and often for a diagnosis for which the patient had recently been seen by another provider.

3.18 Healthcare visits at each of the 60 or so DAIYA-staffed facilities are managed in this same way, and each visit is billed to the government, whether healthcare services were needed or not.

3.19 There was in addition a recent directive to all providers from COO Lafrenz which indicated that, if a provider could not see the patient due to their being unavailable for any reason, the provider would have to find another patient to complete a face-to-face visit. In short, patient load supersedes patient need, and treatment providers are encouraged to bill for unnecessary treatment. Many providers simply copy and paste treatment plans and bill for diagnoses they are not trained to address or did not address.

3.20 Ms. Nyman's prior experience at other facilities and expectation here was that patients in the long term care setting regularly have fairly stable medical issues. Most of them are in this setting for support of diagnoses no longer requiring hospital-level care or are living in the nursing home until their demise; for the majority, acute medical care is no longer needed. While they may be medically more fragile than the general population due to their age and, more

Teller Law
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

often than not, lack of self-care, they do not generally need to be treated by multiple specialized or high-level providers each week.

3.21  Nevertheless ALL patients in Fir Lane and, on information and belief, all other Diaya-staffed facilities are seen at this frequency. As the IM ARNP, Ms. Nyman has no reason, for example, to see a patient for psychological disorders, which are not her specialty, and no reason to see them again for COPD soon after she or another provider saw them for that condition. Nevertheless that is how the schedule mandated her to see patients.

**D. Overscheduling of visits with specialty providers**

3.22  There is an emergency after-hour on-call ARNP, regulatory visits by a physician every 30 days, and everyday care by Ms. Nyman as the in-house provider. The use of, and billing for, additional specialty providers, scheduled to simply check in on stable patients on a weekly basis is inappropriate, unnecessary and fraudulent.

3.23  For example, Ms. Nyman has been scheduled to see patients with Internal Medicine diagnoses, such as Hypertension, (HTN), Congestive Heart Failure (CHF), and Chronic Obstructive Pulmonary Disease (COPD) who were seen as recently as one day prior by Dr. Schubert, and vice versa. In the absence of a sudden turn for the worse, a need to monitor a response to a major change in medication, or other special circumstances, there is no need for patients with these chronic conditions to be seen weekly by an internal medicine provider, much less by two providers on back to back or nearly back to back days.

3.24  Nevertheless, Ms. Nyman, as well as the internal medicine physician are scheduled to see patients for both pain and mental health disorders, for which DAIYA Healthcare employs specialty providers as well. Ms. Nyman, as an IM ARNP would normally see stable patients on either a monthly or tri-monthly basis if critical indices of those conditions were stable.

COMPLAINT AND JURY DEMAND - 7

**Teller Law**
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

3.25 Specifically, there is a Cardio-Vascular ARNP who conducts telemedicine visits at Fir Lane named Courtney Rowland. Ms. Nyman reviewed patient charts regularly, and saw the charting from Ms. Rowland. Most of the charting done by Ms. Rowland reflects stable patients with no need for a Cardio-Vascular specialist in addition to the Internal Medicine providers. Most of the documentation is simply a report of blood pressures and pulses, the great majority of which are stable; medication and lab documentation is frequently absent, and many of the more complex patients are seen by a cardiologist regularly. This means that most of Ms. Rowland's visits are unnecessary, particularly since the other two internal medicine providers (Ms. Nyman and a physician) see the same patients for the identical cardiovascular diagnoses, such as hypertension, hyperlipidemia, and atrial fibrillation, but without any acute change that would reflect a need for Ms. Rowland's regular check ins. Many such patients also see non-DAIYA-employed cardiologists.

3.26 Similarly for residents with COPD, stable oxygen saturations, documentation of the patient's ability participate in Activities of Daily Living (ADL's) or exams reflecting "normal respiratory effort" and the like, without changes in or onset of critical indices such as Shortness of Breath (SOB), Dyspnea on Exertion (DOE), Orthopnea, Edema, Chest Pain, or oxygen desaturation, regularly indicate that the patient (even those with preexisting COPD diagnoses and other chronic pulmonary conditions) are stable in terms of their respiratory disease and do not need to be re-assessed routinely. It does not make sense to see (and bill for visits with) these patients on a weekly basis without any reported change in their condition.

3.27 Similarly for patients in chronic pain, if reported pain levels are documented as "low," or "well controlled with current pain medication," if the patient is on a non-opioid or low-level opioid drug (e.g., with a Morphine Equivalent Unit score of 15), or has been maintained for

COMPLAINT AND JURY DEMAND - 8

Teller Law
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

some time at even a higher dosage without adverse reactions, and if there are no uncontrolled side effects of pain medication, such as constipation, oversedation, drug-seeking behaviors, or notes from staff or requests from the patient that they are having pain, then there is no indication that visit from a pain specialist is indicated on a routine basis. Nevertheless Ms. Nyman observed in the charts that Tamara Mickelson, ARNP, the pain specialist at Fir Lane (as well as the rest of the pod) saw the same patients on a routine weekly basis, generally documenting that the patients had neither escalations of pain, new pain complaints, or untoward side effects from their current pain medications, even those on opioids. The charts Ms. Nyman has reviewed look as if Ms. Mickelson is cutting and pasting from week to week. As with the Cardio-Vascular patients, both of the internal medicine providers (Ms. Nyman and the assigned physician) were frequently scheduled to see patients for pain diagnoses within days of the pain specialist.

3.28  Finally, for patients with depression, documentation reflecting "no behavioral disturbance," "happy," "doing ADL or sleeping," without a change in mental status or documentation, indicate that repeated patient visits are inappropriate. Similarly for patients with advanced dementia, such as those with very low BIMS scores, or where the review of symptoms was deferred due to "dementia," or the chart reflects a nonverbal status of the patient due to dementia, there is no reason to repeatedly see the patient and charge for that time. Again, as with the other specialists, these visits nearly overlap with the internal medicine providers who see the same patients for mental health diagnosis identical to those the MSC schedules the psych provider to address, commonly just days apart.

**E. Equipment necessary for a CV telemedicine visit was not used**

3.29  As referenced above, Courtney Rowland is a cardiovascular ARNP. Ms. Nyman regularly observed that Ms. Rowland spent in the range of just two hours performing her 16

COMPLAINT AND JURY DEMAND - 9

Teller Law
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

telemedicine visits for the day. Ms. Nyman is aware of this because the assistant with whom Ms. Nyman shared an office was also the telemedicine assistant for Ms. Rowland. Ms. Nyman was aware of how long the telemedicine assistant was absent from the office in support of Ms. Rowland's scheduled work. To the extent that Ms. Rowland, during the period of Ms. Nyman's employment at Fir Lane (July 31 to September 12, 2020), billed for a half hour visit, that is likely to be upcoding at a minimum.

3.30 For example, Ms. Nyman recalls that Ms. Rowland recorded in a patient chart that she spent 30 minutes for reviewing a lab result for a urinary tract infection. It simply does not make sense that a cardiac nurse would track this lab result, or require half an hour to do so.

3.31 Additionally, Nurse Rowland indicated in multiple charts that the remote digital stethoscope (made by "Eko") is broken so she is not able to document heart and lung sounds. In addition, Ms. Rowland documents both a HEENT exam (which is a physical exam that would not be possible by telemedicine) as well as a peripheral exam of the Lower Extremities (LE). It is improbable that her assistant (an "MSC") could do this and hold an iPad for the telemedicine camera close to the exam site at the same time. Further, the MSC, Jenifer Southworth, does not have an appropriate license to do such exams and interpret and report her impressions of the findings.

3.32 If the telemedicine stethoscope is really broken, then it is upcoding for Nurse Rowland to bill for a Cardio-Vascular visit.

F. Defendant DAIYA "upcodes" services

3.33 As was referenced above, another provider related to Ms. Nyman that, in conversation with CEO Chris LaFrenz, the provider expressed that she felt overwhelmed by the expectation to appropriately visit 16 scheduled patients when some of them needed no care and

others needed more than a half hour visit. The provider, whose name has been disclosed to the government, has indicated that Ms. LaFrenz responded that, to meet her quota of 16, she should find a patient with a lab result that came back, "pop" or "poke" her head into the appropriate patient's room (to 'see' the patient), and create a visit around the lab result. This is fraud.

3.34 In an e mail from Ms. Nyman to Chris Lafrenz about workload concerns arising from Ms. Nyman's responsibility to provide accurate documentation for billing, Ms. LaFrenz responded by praising Ms. Nyman's documentation and suggesting she use billing code 99356 which indicates the time with the patient was 65 minutes or more, and encouraged Ms. Nyman that part of this time could be used for other purposes, including charting.

**G. Billing for Charting and Chart Reviews**

3.35 Although Dr. Walia is CEO and was Medical Director (now "Chief Medical Officer"), witnesses are anticipated to testify that he is almost universally unavailable to staff by e mail, voicemail or telephone. To the extent he must be available to providers with needs, he is not. If he is billing for supervision, it is not happening.

3.36 Instead, Dr. Walia, the CEO of DAIYA Healthcare, on information and belief, co-signs all ARNP and PA chart notes, from approximately 60 facilities, each of which has at least one in-house internal medicine ARNP. If each in-house provider sees the mandated 16 patients, this would generate 80 (or for two-provider facilities, 160) charts daily per facility, totaling well over 960 chart notes per day, just for the Internal Medicine ARNPs (since some facilities have two IM providers assigned in house).

3.37 Additionally, DAIYA employs 4 to 5 "specialty" providers on each "pod" team. Each "specialist" visits one of the facilities each day, creating another 16 x 60 = 960 chart notes

Teller Law
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

daily. Thus if he reviews them all, Dr. Walia signs off on at least 1920 notes daily. If each takes only one minute, that would take 32 hours a day.

3.38 More recently, Dr. Walia also assumed the role of Chronic Care Manager. In that role, he reviews residents' medications and makes recommendations for changes. On information and belief, he creates a non-face-to-face note and billing entry for each of these recommendations. He then creates a record of a "visit" for the Internal Medicine ARNP, who is mandated to review Dr. Walia's recommendations, implement the changes, and again enter a billing code for his/her own medication review and implementation.

3.39 On information and belief, Dr. Walia bills for both of these services (Chart Review and Chronic Care Management Review) in addition to the services provided by the other DAIYA staff.

3.40 If Dr. Walia is charging, e.g., for Chronic Care Management at Fir Lane, and on information and belief, at any facility, he is doing so without seeing patients.

3.41 DAIYA also employs RNs who evaluate the patient's notes when they are admitted to the facility and create records for both an admission visit and a next day visit for the Internal Medicine ("IM") ARNP to perform, both of which are then billed as ARNP visits. Presumably the records review by the RN has also been billed, at least until recently.

3.42 A recent directive to all providers from COO Lafrenz which indicated that the practice of "chart reviews" which were billed as patient visits would no longer continue. If DAIYA has not voluntarily returned payments it received for said reviews, this is also fraud.

**H. These are Fraudulent Misrepresentations**

3.43 The purpose of the foregoing is to obtain monies for DAIYA from the United States and Washington State governments, which monies they would not otherwise obtain.

COMPLAINT AND JURY DEMAND - 12

3.44 Defendant knowingly presented, or caused to be presented, to an officer or employee of the United States and Washington State governments, false or fraudulent claims for payment or approval.

3.45 Defendant knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the governments.

3.46 Defendant and its employees conspired to defraud the governments by getting a false or fraudulent claim allowed or paid.

3.47 Defendant's representations to the governments or their agents when they billed Medicare and/or Medicaid-eligible patients for upcoded or unnecessary services were false representations of material fact.

3.48 Defendant's representations to the governments or their agents regarding the nature and/or purposes of the treatments for Medicare and/or Medicaid-eligible patients were false representations of material fact.

3.49 Defendant made these false representations of material fact knowingly as that term is defined in 31 U.S.C. § 3729(b).

3.50 The false representations were believed by the government and acted upon by the government to its damage.

3.51 These practices resulted in billing for more services than actually were provided, and resulted in Defendants receiving more money from Medicare, Medicaid and related programs than they were entitled to.

3.52 Based on information and belief, these fraudulent practices have been ongoing and continuing for a period of years before Relator Nyman's employment and continued after her

termination, and are part of a larger scheme by Defendant to "upcode", upcharge, and knowingly bill for unnecessary services.

### I. Wrongful Retaliatory Termination

3.53  As stated, Ms. Nyman initially worked for DAIYA at the "North Pod" locations via telemedicine from her home, managing pain, which is one of her specialties. She was tapering pain medications per the *HHS Guide for Clinicians on the Appropriate Dosage Reduction or Discontinuation of Long-Term Opioid Analgesics*. Dr. Walia co-signed her notes in that role, as he did in her later Internal Medicine role at Fir Lane. He had promised her that "nothing would happen to her" if she followed these guidelines. She relied on this promise.

3.54  Ms. Nyman had remained in the North Pod doing pain management for a little over three months when Ms. LaFrenz informed her by phone that she would be terminated.

3.55  Ms. Nyman recently learned from a staff member at Richmond Beach Rehab who was Ms. Nyman's former MSC Assistant that the nursing home administrator and DAIYA conspired to remove Ms. Nyman from of a North Pod facility out of fear that she would report substandard care and overmedication of patients on opioids which were not in line with the above-referenced HHS Guide.

3.56  The other IM ARNP providers from her previous North Pod facilities have told her they (and the Resident Care Managers to their knowledge) had no complaints with her pain management treatment, but rather the opposite, namely they were happy she was reducing patient risks and side effects by tapering down their pain medications.

3.57  Relator Nyman was removed from her pain specialist position because DAIYA preferred to put her patients at risk in order to keep the nursing home administrator happy and so that DAIYA could continue billing and/or overbilling at the North Pod facilities.

3.58 As a result Nyman suffered lost wages for a transition period and an increased time and cost for travel to Fir Lane for her reemployment, along with other damages.

3.59 After rehire at Fir Lane, Relator Nyman questioned and opposed the above-referenced fraudulent billing, as well as opposed DAIYA's failure to report Covid-19 positive patients and quarantine exposed staff.

3.60 Many of these interactions were related to an investigation of potential fraud pursuant to 31 U.S.C. §3730(h), and were taken in efforts to stop said unlawful practices and were therefore protected from retaliation or otherwise from leading to her termination. Nevertheless they caused Relator Nyman's termination as that term is defined in said statute.

**IV. CLAIMS OF THE UNITED STATES and THE STATE OF WASHINGTON**

4.1 The facts stated above give rise to a violation of the Federal False Claims Act, 31 U.S.C. 3729 *et seq*. and RCW Chapter 74.66, the Washington State Medicaid Fraud False Claims Act.

4.2 The defendants are liable for the actions of their agents, and their employees under the doctrine of Respondeat Superior.

**V. DAMAGES SUFFERED BY THE UNITED STATES and STATE OF WASHINGTON**

5.1 As a proximate cause of the fraudulent practices described above, the United States of America and the State of Washington have suffered damages in amounts fraudulently billed to them and paid by them.

**VI. CLAIMS OF RELATOR NYMAN FOR HERSELF**

6.1 Relator Nyman's employment was terminated because she opposed illegal practices referenced herein. This conduct violates 31 U.S.C. §3730(h). As a separate claim arising out of similar facts, this conduct violates the common law of the State of Washington,

specifically the tort of Wrongful Discharge in Violation of Public Policy in reference to not only the False Claims Act but also patient safety codes, healthcare provider ethics and the governor's covid-19 safety related mandates.

## VII. DAMAGES SUFFERED BY RELATOR NYMAN

7.1 As a proximate cause of the fraudulent practices described above Relator Nyman has suffered damages in the form of lost wages, damage to her career (future earning capacity), general damages for emotional distress, and other actual damages.

## VIII. PRAYER FOR RELIEF

**WHEREFORE** plaintiff prays for damages as follows on behalf of the United States, and/or on her own behalf as appropriate:

**On behalf of the United States:**

1. Economic damages in an amount to be proven at time of trial.

2. A civil penalty of not less than $5000 and not more than $10,000 per violation.

3. Treble damages as provided for in 31 U.S.C. §3729(a).

**On behalf of JEANETTE NYMAN:**

4. Lost wages and benefits of employment, both past and future, lost future earning capacity, and other economic damages in amounts to be proven at time of trial, including double back pay

5. General damages for emotional distress.

6. Other actual and/or special damages in amounts to be proven at time of trial.

**On behalf of either or both the United States and JEANETTE NYMAN.**

6. Prejudgment interest.

7. Reasonable attorney fees and costs.

8. Whatever additional damages the court shall deem to be just and equitable.

COMPLAINT AND JURY DEMAND - 16

Teller Law
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

## IX. JURY DEMAND

A Jury is hereby demanded by Relator on behalf of herself and the governments of the State of Washington and these United States of America.

DATED this 5th day of October, 2020.

_____
Stephen A. Teller, WSBA #23372
Attorney for Relator Nyman